**Robert F. CHRISTIAN, II, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–165C.

United States Court of Federal Claims.

July 10, 2001.

John K. Larkins, Jr., Law Offices of Chilivis, Cochran, Larkins & Bever, LLP, Atlanta, GA, for plaintiff. W. Carl Lietz, III, Nickolas P. Chilivis, and J.D. Dalbey, Law Offices of Chilivis, Cochran, Larkins & Bever, LLP, Atlanta, GA, of counsel.

Armando O. Bonilla, with whom were James M. Kinsella, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, and David W. Ogden, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. Lt. Col. Jill Grant, Chief, Military Personnel Litigation, Army Litigation Division, U.S. Department of the Army, Arlington, VA, of counsel.

## *OPINION*

SMITH, Senior Judge.

### I. INTRODUCTION

In the June 5, 2000 Opinion, *Christian v. United States,* 46 Fed.Cl. 793 (2000)(hereinafter Liability Opinion), this court ruled that the Memorandum of Instruction (MOI) issued by the Secretary of the Army to the 1992 Army Competitive Category Lieutenant Colonel Selective Early Retirement Board (SERB) unconstitutionally discriminated on the basis of race, creating race-based evaluation criteria and revote procedures. That opinion presents the pertinent facts, which do not require wholesale repetition. The court certified the class of nonminority males [1] "as to liability" and "require[d] further proceedings on the question of remedies, especially in light of class certification on liability," *id.* at 817.

A status conference was held on September 11, 2000 and highlighted the parties' diametrically opposite views on which remedies are appropriate. Plaintiff stated its position that the appropriate remedy is court-ordered active duty back pay and corresponding non-monetary remedies, such as "constructive service" remedies authorized under the Military Pay Act, 37 U.S.C. § 204, the military records correction statute, 10 U.S.C. § 1552, and the Tucker Act, 28 U.S.C. § 1491(a)(2). The government, however, requested that, pursuant to RCFC 60.1(a)(i) and (ii), and 28 U.S.C. § 1491(a)(2), the en-

---

1. For remedies purposes, plaintiff seeks to include survivors into the class. The request is granted as stated below.

tire case be remanded to the Secretary for reconsideration by a reconstituted SERB. Describing the remand as a "harmless error" process, the government alleged that "[i]f the Court were to award all the relief requested by Plaintiff's counsel, regardless of merit, well over 1,000 people would receive an unjust windfall at the expense of both the taxpayers and military morale." Tr. of Status Conference at 18. The court ordered a round of briefing on remedies and an additional oral argument. Plaintiff also filed a Motion to Require Immediate Preparation of List of Potential Class Members, Retrieval of Personnel Files, and Tagging of Financial Files (Motion to Compel), which defendant asked the court to reject for mootness. At oral argument, the court from the bench DENIED defendant's request for remand and GRANTED plaintiff's request for remedies. Subsequently, plaintiff's counsel submitted for the court's approval a Draft Agreement regarding attorney fees, a consulting fee for LTC Christian, and expenses. This Opinion contains full explanations of the court's ruling on remedies, the Motion to Compel, and the Draft Agreement.

The United States and its military officers have a special relationship. No other profession asks so much of a man or a woman undertaking it. At the same time, there is no other profession on which the very existence of this country and its ideals depend so much. General Douglas MacArthur gave this definition of the Army officers' calling:

> Duty—Honor—Country. Those three hallowed words reverently dictate what you ought to be, what you can be, what you will be.... [T]hrough all this welter of change and development [in politics, economics, and technology], your mission remains fixed, determined, inviolable—it is to win our wars. Everything else in your professional career is but corollary to this vital dedication. All other public purposes, all other public projects, all other public needs, great or small, will find others for their accomplishment; but you are the ones who are trained to fight: yours is the profession of arms—the will to win, the sure knowledge that in war there is no substitute for victory; that if you lose, the nation will be destroyed; that the very

> obsession of your public service must be Duty—Honor—Country. ... [S]erene, calm, aloof, you stand as the nation's warguardian, as its lifeguard from the raging tides of international conflict, as its gladiator in the arena of battle. For a century and a half you have defended, guarded, and protected the hallowed traditions of liberty and freedom, of right and justice....

> You are the leaven which binds together the entire fabric of our national system of defense. From your ranks come the great captains who hold the nation's destiny in their hands the moment the war tocsin sounds. [You] never failed us. Were you to do so, a million ghosts in olive drab, in brown khaki, in blue and gray, would rise from their white crosses thundering those magic words—Duty—Honor—Country.

Address by General of the Army Douglas MacArthur to the Members of the Association of Graduates, U.S.M.A., The Corps of Cadets, and Distinguished Guests upon His Acceptance of The Sylvanus Thayer Award, United States Military Academy, West Point, New York, at 1, 5–6. (May 12, 1962)(on file with the U.S.M.A. Public Affairs Office).

When individuals accept officer commissions and assume so sacred a trust, this nation in turn fulfills its part by offering these officers pay and benefits for the duration of their service. The nation also promises, through its Constitution, that its officers who defend liberty abroad will enjoy equal rights and liberties at home. The appropriate remedy for improper retirement because of racial discrimination must honor both of these commitments. It must be consistent with the "unique characteristics and commitment of military service" and "with the Court's historic jurisdiction." Tr. of Oral Argument at 48.

To be sure, the government's "harmless error" proposal addresses important considerations: Secretarial powers over defense policy and protection of the public treasury's integrity. Yet the government's position must yield to the judgement of Congress, acknowledged by the courts, that constructive service remedies are necessary. The

details of allowed remedies, however, are a matter for further proceedings in this case.

## II. CONSTRUCTIVE SERVICE DOCTRINE

The "constructive service" doctrine is one of the most venerable in this court, originating with *Smith's Case*, 2 Ct.Cl. 206, 1800 WL 464 (1866). The plaintiff, an assistant quartermaster in the Army, was dismissed by an order of the Secretary of War. President Abraham Lincoln subsequently revoked the dismissal order on appeal. The Army, however, refused pay for the time between dismissal and reinstatement. The government took the position that "[i]t may be the misfortune of this claimant to have fallen under unjust censure, requiring his removal from office, but the power to appoint includes the power to remove all military officers." *Id.* at 208. The court found that constructive service pay was required:

> When the order of dismissal was revoked, it was revoked from its inception, and altogether, because from its nature, it was indivisible and could not operate for a term ... for though an officer may be suspended from his duty, he cannot be suspended from his office ... [and] the reason for revoking [a dismissal] goes ˙to the whole, and not to the part of it, and such is to be taken as the purpose of the revocation. If the dismissal was revoked from its inception, all the consequences were annulled, and the petitioner ... [is] entitled to the pay and emoluments fixed by the law for that rank [which he had at the time of the dismissal].

*Id.* at 209.

As *Smith's Case* illustrates, the constructive service pay remedy exists because of the nature of the relationship between members of the Armed Services and the United States: a relationship based on commissions or term offices. The commission system assures the service members of their status until they are properly discharged. This status necessarily involves the emoluments of office.

The doctrine continues to be recognized in cases under the Military Pay Act, 37 U.S.C. § 204, the money-mandating statute in this case. "Section 204 provides that 'a member of the uniformed service who is on active duty' is 'entitled to the basic pay of the pay grade to which assigned.' An officer's right to pay under Section 204 continues until the officer is *properly* separated from the service ... If [his] discharge was involuntary and improper, his statutory right to pay was not extinguished." *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed.Cir.1999) (emphasis added). In fact, even though the government rejects the constructive service doctrine out of an avowed desire "to possibly avoid liability in whole or in part," Def. Br. at 10, the court noted in the Liability Opinion that "[i]f his discharge was involuntary and improper, [plaintiff's] right to pay under 37 U.S.C. § 204(a)(1) was not extinguished." *Christian*, 46 Fed.Cl. at 799 (citing *West v. United States*, 35 Fed.Cl. 226 (1996)). The Liability Opinion also alluded to the doctrine in declining to resolve "whether the [Phase II] revote procedure actually displaced members of the class who would otherwise have been retained." *Christian* at 802.

Retirement by the SERB is involuntary. *See Adkins v. United States*, 68 F.3d 1317, 1321–22 (Fed.Cir.1995) (interpreting the SERB's organic statute, 10 U.S.C. § 638). In this case, retirement of plaintiff Christian was also legally improper, because the revote and the evaluation criteria in the MOI violated the equal protection component of the Fifth Amendment's Due Process Clause.

Nonetheless, the parties disagree whether plaintiffs suffered the type of harm for which the constructive service remedy is appropriate. Defendant defines harm as "an opportunity to compete for retention in an environment free from unlawful discrimination." Def. Br. at 13 (citing *Campbell v. TVA*, 613 F.Supp. 611 (E.D.Tenn.1985) (rejecting an Age Discrimination in Employment Act claim)). Plaintiff contends that the procedurally flawed and improper retirement itself was sufficiently harmful. For support, he chiefly relies on *Doyle v. United States*, 220 Ct.Cl. 285, 306, 599 F.2d 984, *as amended,* 220 Ct.Cl. 326, 609 F.2d 990 (1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980), which held that unlawfully separated plaintiffs "were entitled to their position, rank, and pay until they were termi-

nated from active duty under proper authority." Plaintiff also invokes persuasive authority, *Dilley v. Alexander,* 627 F.2d 407, 411 (D.C.Cir.1980), *as clarified,* 627 F.2d 407 (D.C.Cir.1980) (plaintiff is "entitled to receive the benefits of constructive active duty from the date of his erroneous release until the day he is restored to active duty.")

Defendant argues that *Doyle, Dilley,* and their progeny are distinguishable and do not support the application of the constructive service doctrine here. Those cases involved passovers of officers by improperly constituted promotion boards, and the distinction lies in supposed judicial rulings "that illegally composed selection boards were *per se* harmful and, consequently, all promotion non-selections and resulting separations were void *ab intitio.*" Def. Br. at 17. But the composition of the boards is not the harm on which the *Doyle* line relief holdings turned. Rather, the harm was the loss of careers due to erroneous discharge:

> We must remember that appellants are career officers; deprivation of their livelihood was not a momentary insult that ended the instant they were thrown out on the streets. Rather, appellants faced the loss of their careers, and with it the loss of attendant benefits they would have earned and received during this period following the termination of their service as officers.
>
> *Dilley,* 627 F.2d at 411.

*Doyle,* a case brought by commissioned Army Reserve officers challenging their discharge that resulted from promotion passovers by selection boards without any Reserve members as required by statutory procedure, rejected a similar "harmless error" proposal, and indicated that "[p]roper analysis ... involves the effect the error had on ... actual pay consequences." 220 Ct.Cl. 285, 305, 599 F.2d 984. In *Doyle,* as here, the government invoked *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), for the proposition that a nexus is lacking between the violation and the decision to release plaintiff from service. *See* 220 Ct.Cl. at 301, 599 F.2d 984.

In *Doyle,* the Court of Claims first found that "some errors are so inimical to judicial or fair process that their violation cannot be tolerated under any circumstances ... [and a]pplication of the test of harmful error would result in the dilution of the afforded protection." *Id.* at 302, 599 F.2d 984. Because, unlike *Mt. Healthy,* "the error in ... [*Doyle* was] a violation of the plaintiffs' rights to fair procedure or process, ... Congress' purpose would be thwarted unless the Secretary is aware that this is a ... requirement that cannot be waived." *Id.* at 303, 599 F.2d 984. Where "the procedural violation penetrates to the heart of the process ... deemed necessary for fair judgement in selecting officers, ... [it] is presumed prejudicial in accordance with the policy" of the law. *Id.* Although this case concerns procedural protections of the Constitution, the policy considerations are, at the least, no weaker than in *Doyle.*

This rationale illustrates the weakness of the government's other argument in favor of remand, that is, deference to Secretarial authority over Army personnel management. Since the whole purpose of constitutional government is to circumscribe the authority of government officials, allowing the Secretary to unconstitutionally retire the officers because he could prove later that some of them should be retired anyway would in practice destroy the constitutional restraint.

Hypothetically, the Secretary may decide to effect a reduction in personnel by a certain percentage of the total force to satisfy national security priorities—a permissible and laudable objective. The Secretary, however, is prohibited by the Constitution from discharging all Catholics because they approximate the percentage of the force slated for reduction. Should the Secretary do so, a remand for a reconstituted board would amount to a grant of authority to temporarily cut off careers and endanger the livelihoods of all the Catholics in the Army. The government argues that the Secretary would presumably never act in such an arbitrary and capricious manner, and the court firmly believes no Secretary in our government would so act. However, constitutions are not primarily made to restrain those who do good. Our Framers understood that all of us have the capacity to violate people's rights, wheth-

er with good or evil intent. In fact, here the Secretary employed an improper racially discriminatory scheme. It is not this court's function to determine the intent, but rather to protect the rights of those whose rights were taken. One could only fathom the damage to the morale of officers were this court to tell them that the best remedy they can get is a limited legal procedure.

*Doyle's* second reason for rejection of the "harmless error" approach was the impossibility "for a reviewing body to determine what effect the error had on the judgment of the original proceeding ... [since r]ecommendations ... are the product of subjective, secret evaluations of officers by officers." 220 Ct.Cl. at 303, 599 F.2d 984. Personnel evaluations in the military operate on a whole-man concept. It cannot be reduced to a mere list of credentials requirements which is the typical approach in civilian employment or educational admissions. Not surprisingly, *Doyle* held that remand to a reconstituted board would actually "delve into the selection boards' exercise of discretion" because "[i]n no way can the proper influence of Reserve officers be injected into the original process, after the fact, in order to determine the effect it might have had on the judgment of the board." *Id.* Since the same approach to evaluation is used by the SERBs, deference to the military's expertise on qualifications of officers and practical impossibility to measurably modify the evaluation compels the same result here.

Moreover, the difficulties in fashioning a harmless error remedy in the whole-man evaluation context are only compounded by the fluid standards created by the racial classification here, such as less-important assignments or lower evaluations of minorities. As this court found, "these standards ... do not eliminate instances in which an assignment of lesser importance came from non-discriminatory sources (including personal wishes of the officer), or instances in which the lower evaluation report came from simple poor officer performance ... [and] leaves these factors open to broad discretion." *Christian,* 46 Fed.Cl. at 813–14. Thus, the government's remand proposal "does not demonstrate that the error was harmless nor render the origi-

nal error harmless as to those officers passed over by the new procedure." *Doyle* 220 Ct.Cl. 285, 599 F.2d 984, 996.

The government seeks to cast doubt on *Doyle's* continued validity in light of a recent decision in *Texas v. Lesage,* 528 U.S. 18, 19, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999), reaffirming *Mt. Healthy.* ("Our previous decisions on this point have typically involved alleged retaliation for protected First Amendment activity rather than racial discrimination, but that distinction is immaterial. The underlying principle is the same: the government can avoid liability by proving that it would have made the same decision without the impermissible motive."). In *Lesage,* the Supreme Court held that plaintiff did not allege a "congizable injury under [42 U.S.C.] § 1983" in a suit over denial of his application to a Ph.D. program through race-conscious review by the admissions committee. Defendant, however, was able to present conclusive affidavit and data evidence showing that his application was eliminated from consideration early in the process, and that all other applicants admitted possessed superior, quantifiable credentials such as Graduate Record Examination (GRE) scores and grade point averages (GPAs). On these facts, the Court found no injury "where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the decision regardless." 528 U.S. at 21, 120 S.Ct. 467.

However, on closer examination of *Lesage, Doyle* remains the relevant precedent in this case. First, the whole-man evaluations challenged in *Doyle* and here cannot be reduced to discrete components in the same way that graduate admissions process can be reduced, at least in a significant part, to rating of applicants by GRE and GPA numbers. Due to the nature of the SERB proceedings and the classification itself, which encouraged SERB member discretion, isolating the effect of the discriminatory Phase I and II standards as well as Phase II procedures is impossible. Second, the "harmless error" rule of *Lesage* concerned proof of facts as they were at the time of the alleged violation and injury, not creation of new procedures

and analysis of new outcomes. Tellingly, the government is not offering to produce affidavits or records documenting the journeys of individual personnel files through secret SERB proceedings held all the way back in 1992; nor can it do so. The reconstituted board procedure cannot produce any, much less conclusive evidence of the 1992 SERB's decision-making. Thus, even the arguably more concrete Phase II revote procedure defies post-hoc evidentiary inquiry. Third, *Lesage* did not even mention the line of Supreme Court precedent cited in *Doyle* concerning fundamental procedural violations. *See Doyle*, 220 Ct.Cl. at 302, 599 F.2d 984 (citing *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Whitus v. Georgia*, 385 U.S. 545, ·87 S.Ct. 643, 17 L.Ed.2d 599 (1967)). Therefore, *Lesage* in no way repudiates the teaching of *Doyle* that fundamental procedural errors are inherently prejudicial.

The government contends that its proposal is "consistent with governing law." Tr. of Status Conference at 17. Yet its primary supporting authority resides in certain amendments to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, and the statutory provisions creating Special Selection Boards for promotions, 10 U.S.C. § 628. The Title VII amendments specifically allow an employer defendant to establish that it would have reached the same personnel decision through reconstituting the decision-making process. *See* 42 U.S.C. § 2000e–5(g)(2)(B), 5(g)(2)(b)(ii) (1991). However, these amendments are not even arguably applicable to, much less governing, officer retirements. *See Hodge v. Dalton*, 107 F.3d 705, 708 (9th Cir.1997) ("Title VII is inapplicable to uniformed members of the military."). The ADEA is likewise inapplicable to the military. *See Canonica v. United States*, 41 Fed.Cl. 516, 523 (1998).

The provision which created a Special Selection Board (SSB) for officers passed over for promotions, of course, by its own terms does not extend to decisions of SERBs.

*See* 10 U.S.C. § 628 (directing the Secretary to convene a special selection board to remedy a non-consideration by a "promotion board" due to an "administrative error."). Moreover, the organic SERB legislation, 10 U.S.C. § 638 was enacted as a part of the same Defense Officer Personnel Management Act of 1980 (DOPMA), Pub.L. No. 96–513, 94 Stat. 2835 (Dec. 12, 1980), as section 628. Since "[a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent," SUTHERLAND STAT. CONST. § 46:05, it is safe to assume that the best interest of national security is served by both the SSB and the constructive service approaches to remedies embodied in the law. Applying the relook board approach in section 638 cases would twist legislative intent rather than effectuate it. Far from being persuasive in the government's favor, congressional decision to limit the operation of SSBs to promotion boards counsels against the government's position.

A recent Federal Circuit decision regarding promotion SSBs, *Porter v. United States*, 163 F.3d 1304 (Fed.Cir.1998), in fact reaffirms the *Doyle* approach to remedying certain violations even where Congress made the SSBs available. *Porter* pointed out that the purpose behind SSBs is to leave the disputes on the merits of promotability, essentially questions of military judgement, to the fellow officer members of selection boards. Civilian review bodies, such as Boards of Correction of Military Records, do not automatically void prior passovers in such cases. *Porter*, recognized that under *Doyle* before section 628, in "[i]nstances of fundamental error ... where there is no doubt that the error undermines the outcome," reinstatement and back pay awards by civilian bodies followed automatically. 163 F.3d at 1319. In dicta, the court mentioned that even post-DOPMA "[m]atters such as impermissible considerations of race, sex or religion, or instances of an illegally composed selection board (one thus incapable of producing a legal result) ... [may be readily adjudicated by civilians] without judging the competing qualities of specific military experience records." *Id.* at 1321. A civilian tribunal such as this is just as capable

to recognize the obvious harm and grant the remedy here, where no special military expertise is required. As we noted in the Liability Opinion, constitutional adjudications are the duty of the courts, *see Christian,* 46 Fed.Cl. at 802, and that includes the remedial as well as the liability determinations.

Moreover, Congress specifically rejected a relook board amendment to the SERB scheme in the Floyd D. Spence National Defense Authorization Act for FY 2001. *Compare* H.R. 4205, 106th Cong. §§ 551–53 (2d Sess.2000) (introduced in the House), *with* H.R. 4205, 106th Cong. (2d Sess.2000) (reported by the House) (provisions eliminated), *and* S. 2549, 106th Cong. § 506 (2d Sess.2000) (placed on calendar of the Senate), *with* H. Conf. Rep. 106–945, at 799 (2000) ("The conferees believe that, while such an approach may have merit, this issue requires further study."). "Generally, the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment." SUTHERLAND STAT. CONST. § 48:18. However, the United States appears to urge an end-run on the Congressional decision. Further, plaintiffs submitted to the court a copy of the July 6, 2000 Letter from Douglas A. Dworkin, General Counsel, U.S. Department of Defense, to William G. Paul, President, and Robert J. Grey, Jr., Chairman of the House of Delegates, American Bar Association, regarding the proposed reconstituted boards amendment which stated that "[u]nder current law in the Federal Circuit and the D.C. Circuit, if a court identifies an error in a selection board that applies to the board as a whole (e.g. . . . . instructions to the board), the court may provide full relief, including reinstatement, back pay, and increased retirement benefits to all service members who were not selected by the defective board." Letter at 1–2 (citing *Doyle,* 220 Ct.Cl. 285, 599 F.2d 984 (1979), and *Dilley v. Alexander,* 603 F.2d 914 (D.C.Cir.1979)). Defendant's

counsel strenuously argued that Congress did not really reject the amendment because it is taking the steps to hold hearings on the subject. Tr. of Oral Argument at 13. But legislative deliberations are all the more a reason to apply the law as it is, not as a party would like it to be.

The defendant's position is inconsistent with the nature of relief historically available in this court. The reconstituted SERB the government offers is essentially non-monetary relief. Plaintiff had every apparent right to pursue an injunction assuring equal opportunity to compete in a U.S. district court. But in the U.S. Court of Federal Claims, the remedy is primarily monetary, and entitlement to it turns on the operation of a money-mandating statute. The fact that the statute was triggered by a Due Process violation in no way diminishes the rights that statute confers. Should the Army succeed in persuading the Congress and the President, the SERB statute may, of course, provide in the future for reconstituted relook boards. Until this happens, this court cannot, nor do we have the authority to, force plaintiff to choose which relief he should seek. *Cf. Cooley v. United States,* 46 Fed.Cl. 538 (2000) (plaintiff cannot be forced to pursue APA review of agency decision restricting land use and forego a taking claim).

## III. REMEDIES ISSUES

"Judicial relief provided to military servicemen who have been wrongfully discharged from service has been premised upon one central principle: making the injured men 'whole.' Courts attempt to return successful plaintiffs to the position they would have occupied 'but for' their illegal release from duty." *Dilley,* 627 F.2d at 413. On behalf of the class of all nonminority males and their survivors [2], plaintiff is seeking a variety of status and payment remedies.[3] Government counsel did not specifical-

---

**2.** Inclusion of survivors is obviously necessary to enable full recovery even though they were not included in the liability class. The same applies to other lawfully authorized recipients, such as representatives of incapacitated liability class members. *See* RCFC 23 (administering class actions is at the discretion of the court).

**3.** While plaintiff characterized some remedies, such as correction of records, as non-monetary, the jurisdictional basis for awarding these remedies is a money-mandating statute. *See Christian,* 46 Fed.Cl. at 799 (citing *French v. United States,* 42 Fed.Cl. 49, 53 (1998)). Also, for purposes of the Judgment Fund statute, 31 U.S.C.

ly challenge the substance of each remedy, except objecting to any potential recovery of attorneys fees above and beyond the total sum of other monetary remedies to be awarded.

Plaintiff proposed a thorough, complex, and rather lengthy scheme to administer the remedies. First, the proposal sets in place a process of notification of putative class members, opting them into the class, and collecting data on individual claims. This initial process could have lasted over 200 days. Subsequent to the opting-in, the government would be directed to perform status remedies such as correction of records, consideration for missed promotion and other opportunities, and reinstatement. For some eligible class members, status remedies could take over a year from the opt-in date to be completed. Finally, the proposal called for the government to commence certain payments to class members within sixty days of the opt-in date, while requiring further calculations and payments upon processing of individual claim proofs. This remedial scheme is agreeable to the court in principle.

While plaintiff demonstrated his entitlement to the proposed remedies, the court nevertheless reserves their implementation on a class-wide basis at this time. Instead, the court finds that a more limited notification procedure and an opportunity to seek interlocutory appeal will be most useful. Persuasive considerations of fairness and judicial economy require that the government be given an opportunity to decide whether to appeal the court's ruling on the constructive service doctrine and, at the same time, that all officers who wish to join the class be bound by the ultimate favorable or unfavorable determination of this issue. At the same time, the court has an obligation to minimize potential delays of recovery for individuals due to appeals of its rulings.

However, the timing provisions of plaintiff's remedial proposal pose significant prob-

lems of finality preventing both speedy appellate determination and speedy recovery for individual class members. Appeals from this tribunal may be taken only when it reaches a "final decision" within the meaning of 12 U.S.C. § 1295(a)(3), certifies an "interlocutory order" within the meaning of 12 U.S.C. § 1292(c), or issues a ruling deemed a "collateral order" under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See M.A. Mortenson Co. v. United States*, 877 F.2d 50, 51 (Fed.Cir.1989). On the other hand, the Judgment Fund[4] statute, 31 U.S.C. § 1304, prohibits disbursement of money unless the court issues a "final judgment." *See also* Treasury Financial Manual, Vol. I, Pt. 6, Ch. 3100, § 3115 (2000). In the same way, the judgments payment statute for the Court of Federal Claims requires that payment be made only upon a certified full or partial "final judgment." *See* 28 U.S.C. § 2517 (2000). Judgments are final once they "have become conclusive by reason of loss of the right to appeal—by expiration of time or otherwise—or by determination of the appeal by the court of last resort." *See* GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. III, Ch. 14, at 58 (2d ed.1994) (citation omitted).

Plaintiff's remedies proposal is not appealable as a final decision. The full extent of recovery will not be known, at least for some class members, until they are considered many months into the future by appropriate command and other boards. Considerable efforts and resources will be wasted were individual plaintiffs to proceed with their proving their separate recovery amounts, only to find the case remanded to the Secretary by the Federal Circuit. The proposal also allows for potential adversarial proceedings on fees awarded to attorneys or the consulting fee of Lt. Col. Christian. Individual amounts due to each class member will be initially computed by the Defense Finance

---

§ 1304, back pay judgments do not have to specify the dollar amount. *See* GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. III, Ch. 14, at 16 (2d ed.1994) (citing opinions of the Comptroller General).

4. Payments for the time forward from the date of judgment generally is made out of the funds of the culpable agency, here the Department of the Army. *See* 55 Comp. Gen. 1447 (1976).

and Accounting Service,[5] but, unless each class members accepts the computation, they are ultimately subject to judicial review. *Cf.* 58 Comp. Gen. 311 (1979). Because of these uncertainties, neither would the proposal qualify as an order of final judgment, and payments to class members will be delayed. On the other hand, any immediate action required of the government with regard to status or payment remedies may implicate the collateral order doctrine and further delay the ultimate recovery through appeals. However, uncertainty over outcome on appeal may be significantly diminished were the government allowed to move for certification of today's decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(c) (2000).

Plaintiff's proposal at this stage may also operate to undermine the utility of the class action device by creating a potential for appeal prior to opting in of all the members. The aim of class action litigation is to resolve common claims through a single track of proceedings which produce a binding result on as many claimants as possible. For plaintiffs, the efficiency inherent in a class action comes at the financial cost of supporting a portion of litigation expenses and the risk that an individual claim will be subject to an adverse global determination. These purposes will be defeated if putative members were allowed to sit out the litigation until it was time to collect the judgment. Were the court to direct the administration of remedies and the government chose to appeal, members of the putative plaintiff class other than Lieutenant Colonels Christian and Nix would avoid a large measure of the litigation risk. This misallocation of risk can be corrected through a notification and opt-in process prior to the expiration of time for interlocutory appeal.

## IV. CONCLUSION

Today, the court finds that plaintiff and putative class members are entitled to constructive service remedies requested. This ruling does not represent a final judicial determination. Accordingly, the court directs class counsel to submit within thirty (30)

days a proposal for speedy notification of potential opt-in class claimants for the limited purpose of joining the litigation prior to the final determination on constructive service remedies. At the conclusion of the notification, the court will allow defendant an opportunity to seek interlocutory appeal of today's decision.

Plaintiff's Motion to Compel is denied as moot.

IT IS SO ORDERED.

---

5. Computations in back pay cases are customarily obtained through a call to the agency head, here, the Secretary of the Army, under RCFC 34 and 28 U.S.C. § 2507(a).