**Kevin J. METZ, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No.  00–540–C.

United States Court of Federal Claims.

June 30, 2004.

Gary R. Myers, Weare, New Hampshire, for plaintiff.

Christian J. Moran, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Commercial Litigation Branch, and Robert E. Kirschman, Jr., Deputy Director, Commercial Litigation Branch, Washington, D.C. Captain Kurt Springer, Air Force Legal Services Agency–JACL, Arlington, Virginia, was of counsel.

## OPINION AND ORDER

LETTOW, Judge.

This military pay case is before the Court on defendant's motion to dismiss or, in the alternative, for judgment upon the administrative record and plaintiff's cross-motion for judgment upon the administrative record. Plaintiff, Kevin J. Metz ("Master Sergeant Metz" or "Metz") was a Master Sergeant ("MSgt.") in the United States Air Force who in 1994 was administratively separated from the military under other than honorable conditions in lieu of a trial by court-martial after testing positively for the use of marijuana. Plaintiff asserts (1) that his separation was improper due to the ineffective assistance of his military and civilian counsel in conjunction with his decision to request an administrative separation in lieu of a trial by court-martial, (2) that the urine sample upon which the court-martial charge against him was based was tainted with another person's DNA, and (3) that he should be reinstated in his position and awarded back pay and benefits. The government challenges this Court's jurisdiction to hear MSgt. Metz's claim based upon his voluntary withdrawal from the military and further asserts that the administrative record does not justify granting the relief that Metz has requested. The parties' cross-motions have been fully briefed, and a hearing on the motions was held on January 7, 2004. Based on the briefs and the hearing, the Court determined that insufficient facts were available to determine the jurisdictional question underlying defendant's motion to dismiss. As a consequence, a two-day evidentiary hearing to address jurisdictional facts was held on April 19 and 20, 2004, and the parties submitted post-hearing briefs. The motions are now ready for decision, and, for the reasons set out below, the Court denies the government's motion to dismiss, denies the government's alternative motion for summary judgment upon the administrative record, grants plaintiff's cross-motion for judgment upon the administrative record in part, and otherwise remands the matter to the Secretary of the Air Force for the determination of certain facts related to remedy.

## FACTS [1]

1. *Plaintiff's drug test, interaction with counsel, request for separation in lieu of trial by court-martial, and discharge from the Air Force.*

MSgt. Metz enlisted in the Air Force in 1977. By the Spring of 1994, he had attained the rank of Master Sergeant. He served primarily as a fuel-dispensing boom operator on KC–135 aircraft, conducting in-flight refueling missions for the Air Force. Hr'g Tr. at 19. His primary duty station was at Robins Air Force Base ("AFB") in Georgia. He served in the Middle East during the first Gulf War. *Id.* at 20. It is not contested that his record was exemplary prior to the events underlying this case.

On April 29, 1994, MSgt. Metz provided a urine sample as part of a routine, random drug screening conducted by the Air Force. *Id.* at 22–23. Two weeks later, on May 13, 1994, he was informed that his test had returned positive for marijuana. On May 25, 1994, MSgt. Metz's commander, Lt. Col. Charles Schreck, preferred charges against MSgt. Metz, alleging that he had wrongfully used marijuana in violation of Article 112a of the Uniform Code of Military Justice

---

1. The facts set forth in this section draw primarily upon testimony provided by various witnesses at the evidentiary hearing and constitute the Court's findings of fact based upon that hearing unless otherwise indicated. Facts drawn directly from the administrative record are accompanied by a citation to such record. The administrative record consists of two independently paginated volumes, "AR I" and "AR II."

("UCMJ"). AR I 15.[2] The charge sheet setting forth the averments against MSgt. Metz indicated that the case was to be tried by special court-martial. AR I 16. The urinalysis indicated that MSgt. Metz's urine sample contained a concentration of 21 nanograms/milliliter ("ng/ml") of THC, a metabolite of marijuana. AR I 14. This concentration was relatively close to the military "cutoff level," which at the time was 15 ng/ml—a concentration above this level was considered a "positive." Hr'g Tr. at 159–60. As a result of the positive test result, Lt. Col. Shreck charged MSgt. Metz with having used marijuana between on or about April 22, 1994, and on or about April 29, 1994. AR I 15. MSgt. Metz asserted his innocence throughout and continues to maintain that he did not use marijuana. Hr'g Tr. at 25–26.

At some time during the second half of May 1994, MSgt. Metz contacted the area defense counsel who was then assigned to Robins AFB. Id. at 24–25. The military attorney whom he contacted, who has been identified only as an unnamed captain, informed MSgt. Metz that she was in the process of being reassigned to a different duty station and that he should wait for her replacement. Id. She appears not to have provided MSgt. Metz with any advice or counseling as to his rights or the court-martial proceedings. Id. She left Robins AFB in June, and on July 3, 1994, then-Captain David J. Dusseau[3] arrived at Robins AFB and became the base's area defense counsel. Id. at 171–72. Shortly after his arrival on station, Lt. Col. Dusseau began representation of MSgt. Metz. Id. at 25, 172.

Prior to serving at Robins AFB, Lt. Col. Dusseau had served with the Air Force for approximately five years, with duty assignments first as a prosecuting counsel and then as an area defense counsel. Id. at 128–130, 179–80. During that time he had served as a prosecutor in approximately five courts-martial and as defense counsel in approximately twelve, with approximately nine of those cases going to trial. Id. at 130–31, 179–80. As a prosecutor he had worked on at least one court-martial involving narcotics, id. at 180, but he had never represented a defendant at trial in a drug-related court-martial. Concurrently with the proceedings involving MSgt. Metz, however, he was representing an officer at Robins AFB in an unrelated drug case.[4] Lt. Col. Dusseau had also counseled a number of service members who had ultimately obtained an administrative discharge in lieu of trial by court-martial through a process identical to that ultimately employed by MSgt. Metz.

At the evidentiary hearing, Lt. Col. Dusseau testified as to a number of steps he took early-on in relation to his representation of MSgt. Metz, including requesting, obtaining, and reading the litigation packet provided by the prosecution, meeting with the observer who had been present when MSgt. Metz provided the urine sample, and speaking with the collection monitor who had overseen the collection process. Id. at 135–36. He stated that he believed a polygraph test had been

---

2. The UCMJ is codified at 10 U.S.C. §§ 801–946. Each Section of the U.S. Code within the UCMJ is identified as an individually numbered Article, with Article 1 corresponding to 10 U.S.C. § 801 and Article 146 corresponding to 10 U.S.C. § 946.

Article 112a provides in pertinent part as follows:
(a) Any person subject to [the UCMJ] who wrongfully uses, possesses, manufactures, distributes, imports into the customs territory of the United States, exports from the United States, or introduces into an installation, vessel, vehicle, or aircraft used by or under the control of the armed forces a substance described in subsection (b) shall be punished as a court-martial may direct. (b) The substances referred to in subsection (a) are the following:

(1) Opium, heroin, cocaine, amphetamine, lysergic acid diethylamide, methamphetamine, phencyclidine, barbituric acid, and marijuana, and any compound or derivative of any such substance....
10 U.S.C. § 912a.

3. Dusseau continues to serve in the Air Force and is currently a Lieutenant Colonel stationed at Akota Air Base, Japan. Hr'g Tr. at 126. He testified telephonically at the evidentiary hearing. For consistency, the Court will refer to him as Lt. Col. Dusseau in the remainder of this Opinion and Order.

4. In representing the officer who had been charged with a drug offense, Lt. Col. Dusseau acted in conjunction with a civilian counsel, W. Sander Callahan. Hr'g Tr. at 29, 182–83.

conducted at some point and that the results of such test proved inconclusive. *Id.* at 134.[5] Lt. Col. Dusseau did not consult with an expert regarding the urine sample, either in regard to the possibility or desirability of retesting the sample or with regard to testing the sample for DNA. *Id.* at 139–40, 162–63.

Shortly after his initial consultations with Lt. Col. Dusseau, MSgt. Metz also sought the advice of a civilian attorney, Mr. William Sander Callahan. MSgt. Metz traveled to Atlanta and met with Mr. Callahan in person at his office. *Id.* at 29, 198–99.[6] Their meeting on this occasion was relatively brief, lasting approximately half an hour. *Id.* at 35, 199. MSgt. Metz testified that he paid Mr. Callahan $800 to represent him, *id.* at 31, 35, but Mr. Callahan testified that he had no record of receiving such payment and did not recall being paid by MSgt. Metz. *Id.* at 201–02. Mr. Callahan also explained that his typical fee at that time for representation in a court-martial would have been in excess of several thousand dollars and that an eight hundred dollar fee would have been the "absolute, rock-bottom minimum [he] would have taken to review the case, not to begin to represent [a client]." *Id.* at 201. Mr. Callahan also explained that none of his records reflect his having ever represented MSgt. Metz. *Id.* at 202.[7]

The meeting in Atlanta was the last, and only, face-to-face meeting between MSgt. Metz and Mr. Callahan in relation to the matter. MSgt. Metz testified that he recalled having one or two telephone calls with Mr. Callahan thereafter in which Lt. Col.

Dusseau also participated, *id.* at 29–30 (quoted *infra*, at 22), 36–37, and Lt. Col. Dusseau had the same recollection. *Id.* at 138. For his part, Mr. Callahan testified that he did not recall such telephone conversations and did not recall having any further conversations with either MSgt. Metz or Lt. Col. Dusseau regarding the matter. *Id.* at 203 ("I know at the time I had many, many conversations and meetings and visits with him [Lt. Col. Dusseau] about the pilot. I believe he was a captain. But nothing about Sergeant Metz.").[8]

Approximately eight weeks after Lt. Col. Dusseau's arrival at Robins AFB, on August 25, 1994, MSgt. Metz signed a Request for Discharge in Lieu of Trial by Court–Martial ("Request"). AR I 17. This Request provided as follows:

1. I request that I be discharged from the United States Air Force according to AFR 39–10, Chapter 4, in lieu of trial by court-martial.

2. I understand the elements of the offense with which I am charged.

3. I understand that if this request is approved I may be discharged under other than honorable conditions, regardless of your recommendation. I am aware of the adverse nature of such a discharge and the possible consequences thereof. I know that it may deprive me of veterans benefits.

4. I have been afforded the opportunity to consult counsel. I was counseled by W. Sander Callahan, my Civil Defense Counsel, and Captain David J. Dusseau, my

---

5. MSgt. Metz testified that he had never taken a polygraph. *Id.* at 312. Based upon the strength of the recollections of MSgt. Metz and Lt. Col. Dusseau, as well as the context, the Court credits MSgt. Metz's recollection and discounts that of Lt. Col. Dusseau. There is no record of or reference to a polygraph test in the administrative record.

6. MSgt. Metz had initially met Mr. Callahan briefly when Mr. Callahan was on base in conjunction with his work in an unrelated case. Hr'g Tr. at 29, 198. The meeting on that occasion consisted only of the exchange of pleasantries with no discussion of the facts or merits of MSgt. Metz's case. *Id.* at 198–99.

7. Mr. Callahan testified that he had no recollection of representing Mr. Metz and that he had searched his records to find any record of such representation but had failed to find any reference to representation. Hr'g Tr. at 197–200. Mr. Callahan stated that he kept a log book in which he kept a record of all of his cases and the results and that a review of that log book showed no entries concerning MSgt. Metz. *Id.* at 201–03.

8. During this time in 1994, Lt. Col. Dusseau and Mr. Callahan were working together on the defense of an officer who had been charged with a drug offense in a separate court-martial. Hr'g Tr. at 29, 182, 197–99. They had regular contact with each other in connection with that matter. *Id.* at 182, 197.

appointed Defense Counsel, Robins AFB, Georgia.

5. I have received a Privacy Act Statement.

6. If this discharge request is approved, I understand I am entitled to lengthy service probation consideration. I have read and I understand Section F of Chapter 6 and do not request lengthy service probation consideration in the office of the Secretary of the Air Force in accordance with that section.

AR I 17.[9] MSgt. Metz's Request was also accompanied by a second page that contained the following statement as well as two signature blocks:

The preceding statement by Msgt Metz was his voluntary decision, signed by him after we counseled him fully about:

a. His rights and privileges and,

b. The possible effects of discharge under these circumstances.

AR I 18. The accompanying signature blocks were labeled "W. SANDER CALLAHAN, Esq, Civilian Defense Counsel" and "DAVID J. DUSSEAU, Captain, USAF, Defense Counsel." *Id.* Lt. Col. Dusseau signed both signature blocks with his own name, indicating that his signature on the first line was "(FOR)" Mr. Callahan. *Id.*

Lt. Col. Dusseau testified that Mr. Callahan authorized him over the telephone, when MSgt. Metz was with Lt. Col. Dusseau in Lt. Col. Dusseau's office, to sign this document on his behalf. Hr'g Tr. at 146, 150. Mr. Callahan, however, testified that he gave no such authorization and that he had never seen either the document signed by MSgt. Metz or the document signed by Lt. Col. Dusseau. *Id.* at 208–11. Mr. Callahan explained that the document in the administrative record at AR I 17–18 does not comport with the format or substance of similar documents he produced and used at that period in his practice. *Id.* at 209–11. As regards the signature block, in addition to stating that he did not authorize Lt. Col. Dusseau to sign for him, he explained that his signature typically would be accompanied by his Georgia Bar number, title, and address and would not use the title "Esquire." *Id.* at 208–09. Lt. Col. Dusseau said he had prepared the request for an administrative discharge from a template routinely used by defense counsel. *Id.* at 145–46, 176–77. He did not recall whether he went over with MSgt. Metz in detail the

9. MSgt. Metz's request for separation was made pursuant to Chapter Four of Air Force Regulation ("AFR") 39–10, which at that time provided the authority and framework by which enlisted members of the Air Force could request a discharge in lieu of trial by court-martial. In relevant part, Chapter Four provided:

4–1. Basis for Discharge:
a. Airmen may be discharged under this provision if they:
(1) Are subject to trial by court-martial; and
(2) Request discharge in lieu of trial.
b. Airmen may request discharge if charges have been preferred with respect to an offense for which a punitive discharge is authorized
. . . .
4–2. Types of Discharge Authorized. The fact that the airman is trialable [*sic*] by a court-martial that could adjudge a punitive discharge reflects the serious nature of the conduct. Customarily the service of airmen discharged under this provision will be characterized as under other than honorable conditions. . . .
b. . . . [T]he separation may be characterized as:
(1) General, when such a characterization is warranted under the guidelines in chapter 1, section B; or

(2) Honorable, only if the member's record has been so meritorious that any other service characterization would be inappropriate.
4–3. How Airmen Request Discharge in Lieu of Trial:
a. Airmen applying for discharge in lieu of trial by court-martial must acknowledge understanding of:
(1) The elements of the offense or offenses charged;
(2) The fact that characterization of service as under other than honorable conditions is authorized; and
(3) The adverse nature of such a characterization and the possible consequences.
. . .
c. Before they apply for discharge under this provision, airmen must be given an opportunity to consult legal counsel. . . . Statements the member or counsel for the member make in connection with a request for discharge under this chapter are not admissible in courts-martial except as authorized by MCMUS, Military Rule of Evidence 410.
AFR 39–10 (Aug. 9, 1991). This regulation was superceded by Air Force Instruction ("AFI") 36–3208 on October 14, 1994.

consequences of the request for administrative discharge. *Id.* at 146–49, 165–66.[10]

As for the substance of the Request, Mr. Callahan explained that his practice in the 1990s was to include as part of any Chapter Four request for discharge any available favorable, personal, and mitigating information about his client in light of the fact that such requests are submitted to a decision-maker who does not have to grant the request. *Id.* at 209–10. He also explained that his practice was not to sign such requests unless he had spoken directly with the Staff Judge Advocate ("SJA") responsible for the case to ensure that the request would be granted rather than being used against his client at trial. *Id.* at 210–11. He recalled having no such conversations with the Robins AFB SJA about MSgt. Metz's case, despite his having other conversations with the SJA regarding the separate case he was defending at that same time. *Id.* In this respect, Lt. Col. Dusseau testified that he had talked with the SJA about the Request before it was submitted. *Id.* at 148–49 (quoted *infra*, at 170 n. 31).

Mr. Callahan further testified that his records, as well as the administrative record before the Court, lack a number of indicia of his representation of MSgt. Metz that he explained would have been a standard part of his case file for such a case at the time in question. First, he explained that he typically filed a notice of appearance or letter of introduction to ensure that the SJA knew he was representing the client. *Id.* at 214.[11] He also explained that before he agreed to take on any urinalysis case, upon obtaining the laboratory results, his practice was "always [to] send the records to the civilian expert [he had] used for years and years." *Id.* at 216.[12]

MSgt. Metz signed the Request on the recommendation of his counsel. *Id.* at 33. He explained that the words and actions of both Lt. Col. Dusseau and Mr. Callahan led him to believe that if he had chosen to undergo a trial he would have been convicted. *Id.* at 30 (quoted *infra*, at 169), 31, 38–39. After he signed the Request, it was submitted to the appropriate authorities, and the requested separation in lieu of trial was approved by the SJA and by MSgt. Metz's commander. AR I 19–22. MSgt. Metz received a discharge under other than honorable conditions from the Air Force on September 8, 1994. AR I 23–24.[13] At some point after his separation, MSgt. Metz was employed as a machine operator by the Daimler Chrysler Corporation, which position he held at the time of the evidentiary hearing in April 2004. Hr'g Tr. at 18–19.

The government contends that the Court should find that Mr. Callahan represented MSgt. Metz pursuant to Georgia law. Def.'s Post–Trial Br. at 4–7. Manifestly, the testimony at the evidentiary hearing was in conflict as to whether Mr. Callahan was actively engaged as counsel by MSgt. Metz and what his degree of participation in the matter was. Based primarily on the testimony of MSgt. Metz and to a lesser extent on the testimony of Mr. Callahan, the Court finds that Mr. Callahan was retained by MSgt. Metz for a limited purpose, *i.e.*, Mr. Callahan was retained to examine the charging document and review the file. That limited role was consistent with the amount of money MSgt. Metz testified he paid Mr. Callahan, the amount Mr. Callahan said he would have charged for such examination and review, the single meeting Mr. Callahan had with MSgt. Metz, and the fact that the record does not reflect that Mr. Callahan ever filed a notice

---

10. Similarly, MSgt. Metz did not recall any discussions with counsel about the consequences of an administrative discharge. *Id.* at 40.

11. Lt. Col. Dusseau testified that he believed a notice of appearance had been filed by Mr. Callahan. Hr'g Tr. at 136–37. No such notice appears in the administrative record.

12. Mr. Callahan explained that he regularly hired an expert named Dr. James Woodford to assist him in drug cases. He noted that Dr. Woodford had assisted on the other case on which Mr. Callahan worked together with Lt. Col. Dusseau in the summer of 1994. Hr'g Tr. at 233.

13. At the time of his discharge, MSgt. Metz was credited with sixteen years, nine months, and twelve days of active federal service. AR I 24.

of appearance on behalf of MSgt. Metz in the court-martial proceeding.

In making this finding, the Court has not given full credence to the testimony of Lt. Col. Dusseau. In particular, the Court does not accept his testimony that Mr. Callahan acted as lead counsel and that Lt. Col. Dusseau acted as secondary counsel, that Mr. Callahan had an active role in preparing the request for administrative discharge that MSgt. Metz signed, and that Mr. Callahan gave Lt. Col. Dusseau permission to countersign that request as a counsel for MSgt. Metz. To some extent, Lt. Col. Dusseau's recollection may be clouded by the circumstance that he and Mr. Callahan were actively engaged in jointly representing an officer charged with a drug offense at the same time that the charges against MSgt. Metz were pending.

### 2. DNA analysis of plaintiff's urine sample.

After his discharge was complete, early in 1995 MSgt. Metz contacted a second civilian attorney, Gary Myers, who serves as his counsel in this action and who represented him in the two appeals to the Air Force Board for Correction of Military Records that underpin this case. Hr'g Tr. at 43. Mr. Myers recommended to MSgt. Metz that he seek to have his urine sample retested and analyzed for DNA. On behalf of his client, Mr. Myers obtained an aliquot of MSgt. Metz's urine sample from the Air Force and had it tested for DNA at the Laboratory of Pathology in Seattle, Washington. See AR I 25–49. MSgt. Metz provided the Laboratory of Pathology with a sample of his own blood

for comparison. The DNA test was conducted by Dr. Kristen J. Skogerboe, who also testified at the evidentiary hearing.[14] Dr. Skogerboe found that the test showed the urine sample provided to her laboratory by the Air Force contained the DNA of more than one person. She reported the results of the DNA test, which was conducted in several installments during the summer of 1995, as follows:

> The tested aliquot of the unknown urine sample ( . . . ) was found to contain alleles that are not found in Kevin Metz's reference blood sample ( . . . ). The number of alleles in the unknown urine sample is consistent with DNA from more than one individual, excluding Kevin Metz ,as the sole donor of the unknown urine sample. Although the volume of the urine aliquot was limited, the sample yielded sufficient DNA for analysis. However, repeat analysis with DNA extracted from this urine aliquot is not possible, as the entire aliquot has been consumed.

AR I 66. See also AR I 158–159. In reaching this conclusion, Dr. Skogerboe's laboratory tested the urine sample three times using the "polymerase chain reaction" methodology by which the limited amount of DNA available in the urine sample was isolated and then replicated through a chemical reaction until it had been "amplified" to a degree that allowed its presence and characteristics to be analyzed. Each iteration of the test produced slightly different results.[15] However, Dr. Skogerboe explained that each result was consistent with her conclusion that the origi-

14. The government has not contested the qualifications of the Laboratory of Pathology or of Dr. Skogerboe to conduct and interpret DNA tests. The Air Force has, however, characterized the results of such test as "inconclusive." See AR I 149–151. The Court found Dr. Skogerboe to be a qualified expert and a credible witness and does not have any reason to doubt her qualifications or those of her laboratory.

15. The DNA test used by Dr. Skogerboe identified alleles at a specific locus on the Human Leukocyte Antigen (HLA) DQ alpha gene. See AR I 153. Every individual has a pair of alleles associated with this locus that are identified by a pair of numeric identifiers, with six identifiers available for each allele—1.1, 1.2, 1.3, 2, 3, or 4.

Id. Dr. Skogerboe summarized the alleles exhibited in each test as follows:

| Testing of Metz urine | Alleles found | Assumed Alleles not amplifying |
|---|---|---|
| result on "page 39" first aliquot | 1.1, 3, 4 | 2 |
| result on "page 39" second aliquot | 1.1, 4 | 2, 3 |
| result on "page 35" | 2, 3 | 1.1, 4 |

AR I 159; see also AR I 59, 63. The laboratory summary sheet included with her original report identified alleles 1.1 and 3 for the second aliquot represented on "page 39." AR I 63. The alleles attributed to MSgt. Metz were 1.1, 4, and those attributed to the unidentified other person were 2, 3. Hr'g Tr. at 102–03, 116.

nal urine sample contained DNA from more than one person.[16] Indeed, she testified that the colorimetric testing indicators of the alleles present in the sample indicated that the DNA contributions of the two persons in the sample were of equal intensity and that one did not overshadow the other. Hr'g Tr. at 105–06.[17]

*3. Initial appeal to the AFBCMR, destruction of the urine sample, and request for reconsideration by the AFBCMR.*

After receiving the results of the DNA testing suggesting that the sample had been tainted with another person's DNA, on January 24, 1996, MSgt. Metz filed a petition with the Air Force Board for Correction of Military Records ("AFBCMR" or "Board"). AR I 9. In the petition, MSgt. Metz requested that he be reinstated in the Air Force, that he be given back pay and allowances from the date of his separation until the date of his reinstatement, that he receive credit for the time between separation and reinstatement

for purposes of pay, promotion, and retirement, and that all materials relating to his positive urinalysis and discharge be expunged from his records. AR I 10. The gravamen of the request for relief was the contention that MSgt. Metz's "sample was tainted and cannot serve as a basis for discharge[ ]." AR I 12.

Two and a half years later, without a hearing, on July 24, 1998, the Board denied Metz's request. AR I 2–8.[18] The Board held that Metz had failed to produce sufficient relevant evidence to demonstrate the existence of probable error or injustice. For that conclusion, the Board focused on the lack of evidence challenging the chain of custody of MSgt. Metz's urine sample between the time of collection and the original urinalysis screening. AR I 7–8. The Board further bolstered its holding by referring to MSgt. Metz's failure to demand trial by court-martial and instead submission of a request for discharge, as follows:

> There is no question that scientific advances by 1994 had made DNA testing of urine possible as a technical matter. Indeed, several years earlier, in April 1992, the Air Force Court of Military Review had asked rhetorically in *United States v. Metcalf,* 34 M.J. 1056, 1061 n. 7 (A.F.C.M.R. 1992), "Must the government ... routinely perform DNA testing on its urine samples ...?" In the 1992 opinion, while discounting the notion that the government should be required to conduct DNA testing of every urine sample it collects, the military court in *Metcalf* noted that "the defense always has the option of retesting an accused's sample independently and offering those results found relevant, helpful and probative to the trier of fact." 34 M.J. at 1060 n. 5.
> Colonel Coacher also conceded that a DNA test that showed a sample of urine was tainted with someone else's DNA would call into question the chain of custody:
> Q: As a circuit defense counsel, if you found that a sample your client had was tainted with somebody's DNA, would you not find that a rather rewarding discovery?
> The Witness: Not necessarily. I would—I would—I would still nevertheless be concerned about the chain of custody.
> Hr'g Tr. at 67.

**16.** In an advisory opinion rendered for the Air Force Board for the Correction of Military Records, AR I 149–151, an Air Force attorney opined that the inconsistent results from each of Dr. Skogerboe's three tests should have rendered the tests "inconclusive," describing only one of the three tests as being "consistent with a tainted urine sample." AR I 151. He drew his conclusion from a critique of Dr. Skogerboe's report provided by an Army analyst. AR I 153–54. The Board adopted this reasoning and likewise characterized Dr. Skogerboe's tests as unreliable. AR I 6–7. This characterization appears unduly to emphasize the variation that occurred in the results, due in part to the small size of the available sample, and disregards the fact that two of the three tests showed DNA from someone other than MSgt. Metz.

**17.** At the evidentiary hearing, the government adduced testimony regarding the availability and reliability of DNA testing of urine in 1994 as contrasted to 1995 when the Seattle Laboratory of Pathology conducted its tests. Colonel LeEllen Coacher testified that in 1994 she served as legal advisor to the Air Force Drug Testing Laboratory at Brooks Air Force Base. Hr'g Tr. at 48. In that connection, she had been asked whether it was technically possible to conduct DNA testing of urine samples. *Id.* at 58. At that time, she concluded that it was not possible to do such testing "on a production level basis." *Id.* at 60. In her view, "on an individual case-by-case basis, given that it was ... so expensive at that point in time, ... it was ... just not feasible ... [and] we discounted it. It didn't make sense." *Id.*

**18.** The lengthy procedure before the Board in this instance was engendered in part by the Air Force's commissioning of an advisory opinion about Dr. Skogerboe's report and plaintiff's subsequent response to the Air Force's proffered advisory opinion. *See* AR I 161.

In addition, the applicant had an opportunity to establish his innocence when the court-martial charge was preferred against him by demanding trial by court-martial thereby requiring the prosecution to establish his guilt beyond a reasonable doubt. However, he chose not to pursue this avenue and requested that he be discharged in lieu of trial by court-martial instead. Applicant has not provided any evidence to sufficiently convince the Board that the discharge action was based on erroneous information, that pertinent regulations were violated or that he was not afforded all rights to which entitled at the time of his discharge. Therefore, in the absence of evidence to the contrary, we find no compelling basis to recommend granting the relief sought in this application.

AR I 8.

During the lengthy pendency of his petition before the Board, MSgt. Metz, through his attorney, requested first on February 8, 1996, and then again on May 20, 1997, that the Air Force continue to hold the urine sample indefinitely. AR II 92, 93. On April 17, 1996, the Air Force indicated that it agreed to maintain the sample indefinitely, requesting notification when the sample was no longer needed so that it might then be destroyed. AR II 95.

. On June 8, 1999, a technician at the storage site at Brooks Air Force Base, in the process of destroying other frozen samples that were more than one year old, discovered that MSgt. Metz's sample bottle's cap "was rusted and in bad condition" and that the sample "had an expired extension letter." AR II 134. The technician requested permission to destroy the sample based upon this discovery. She received such authorization, and the sample was destroyed that same day. AR II 134–35.

The discovery and subsequent authorization for destruction of the sample were memorialized in two memoranda. The first was dated November 15, 1999 (more than five months after the sample bottle's destruction), and was written by the technician who discovered the expired sample bottle. AR II 134. The second was dated August 10, 2000 (well over a year after the bottle's destruction, three months after MSgt. Metz had filed a request for reconsideration with the AFBCMR, and two months after the AFBCMR requested advisory opinions from various offices in the Air Force). The second memorandum was written by the Acting Technical Director of the laboratory where the sample had been stored. AR II 135. The second memorandum stated that the destruction of the bottle was authorized because "the bottle had deteriorated, the lid had rusted through, and no specimen was left," and that "there was only a little bit of dried residue in the bottom of the bottle." Id.[19]

Very shortly after the second memorandum was written, a third memorandum was created addressing the fate of the urine sample. On August 18, 2000, the Chief of the Air Force's Drug Testing Division at Brooks Air Force Base wrote to opine that the destruction of the sample had occurred pursuant to a change in Air Force policy in November 1999 regarding the preservation of old urine samples. AR II 132.[20] (His memorandum does not explain how a policy change in November 1999 could bear on an event that transpired in June 1999.) He characterized the Air Force's failure to notify Metz of the change in policy as a "good faith mistake" and referred to the ultimate destruction of the sample as "nothing more than a harmless mistake." Id. He also impugned the alleged benefit that access to the sample would have had "considering the fact that [Metz] had already conducted DNA analysis that was considered upon the AFBCMR initial review." Id.

---

19. No explanation is contained in the record as to how evaporation occurred from a presumably frozen urine sample. Some dehydration from a frozen liquid could be expected if a seal on the sample container had been compromised, but complete drying should have been unlikely. In any event, no effort was made to reconstitute the sample with distilled water or otherwise.

20. This memorandum appears to have been written in response to a request from the AFBCMR. See AR II 132. It is addressed to "SAF/MIBR" at Randolph AFB and was included as an exhibit to the Board's second decision. See AR II 9 ("Exhibit N").

MSgt. Metz was not informed of the destruction at the time it occurred but rather appears to have learned of the destruction of the sample only after his attorney requested on November 1, 1999 (two weeks before the first memorandum discussed above was written), that the original sample be retested as part of a settlement offer. *See* AR II 25. In response to this request, the Judge Advocate General of the Air Force on November 22, 1999, informed MSgt. Metz that "such a test is not now possible." AR II 91.

Several months after receiving word that the sample had been destroyed, on May 8, 2000, MSgt. Metz petitioned the AFBCMR for reconsideration of its 1998 denial of his 1996 petition in light of the fact that the Air Force had destroyed his urine sample. AR II 16–17.[21] He amended his request on May 10, 2000, requesting somewhat different relief from that sought in his first petition. AR II 18–20. Specifically, he requested constructive credit through twenty years of service with back pay, allowances, and full retirement, or early retirement as of the date of his separation. *Id.*[22]

In addressing MSgt. Metz's petition for reconsideration, the AFBCMR "determined that an advisory opinion [was] required prior to presenting [MSgt. Metz's] case to the Board for possible reconsideration." AR II 96. The Board obtained an advisory opinion from the personnel programs management office at the Air Force's personnel center at Randolph AFB, which concluded that MSgt. Metz was not eligible for normal retirement because he had not served twenty years and that he was not eligible for a special early retirement program because he was facing court-martial charges. AR II 98–99. The personnel center further opined that "[t]here are no provisions of law to grant credit for unserved service, nor do we support awarding the applicant credit for over 3 years of unserved active service to permit retirement for length of service." AR II 99. The Board also obtained an advisory opinion from the Judge Advocate's office at the Air Force's personnel center at Randolph AFB. AR II 136–39. This advisory opinion, dated September 5, 2000, recommended that the AFBCMR deny MSgt. Metz's second petition based on the observation that MSgt. Metz had not produced evidence to challenge the chain of custody, that he had caused the urine sample to be tested previously and obtained inconclusive DNA results, and that he had signed his request for separation "after conferring with his military Defense Counsel and his Circuit [sic] Trial Counsel." *Id.* at 138.

Nearly three years thereafter, on July 28, 2003, again without a hearing, the Board denied MSgt. Metz's request for reconsideration. AR II 1–8. The Board based its determination upon a finding that MSgt. Metz had not presented sufficient evidence of error or injustice. It found that the Air Force's destruction of the urine sample was a "a good faith mistake as indicated by the Chief, Drug Testing Division." *Id.* at 7. The Board also reasserted its conclusion in the initial denial of his petition that the DNA analysis performed by Dr. Skogerboe did not overcome the failure to show an error in the chain of custody of the sample, opining that "[e]ven accepting the DNA testing on its face merely proves that his urine sample contained DNA alleles of more than one individual, not the urine of more than one individual." *Id.* The Board criticized Metz's failure to provide "any indication as to whether the additional DNA pattern found in the sample matched any of the technicians at the Armstrong Laboratory at Brooks AFB that analyzed the urine sample." AR II 8. Furthermore, the

---

21. Between learning of the sample's destruction and filing his second request with the Board, MSgt. Metz also filed suit in the U.S. District Court for the District of Columbia, but that case was dismissed for lack of jurisdiction pursuant to the Tucker Act. AR II 22–23, 87–90. During this time, his attorney also attempted to initiate settlement negotiations with the Air Force and requested intervention from the Secretary of the Air Force via the General Counsel of the Air Force. AR II 22–24. This latter request was denied, with an explanation that the AFBCMR is the appropriate venue for seeking changes in records. AR II 21.

22. MSgt. Metz filed his complaint in this Court on September 5, 2000, a few days before the expiration of the statute-of-limitations period established by 28 U.S.C. § 2501, and proceedings in this matter were stayed pending resolution of his request for reconsideration by the Board.

Board again justified its denial of relief based on MSgt. Metz's decision to seek a separation from the Air Force rather than face a trial by court-martial:

> The applicant had an opportunity to review the laboratory procedures and test results in anticipation of his court-martial and to prove his innocence at trial. However, after consulting with his civilian and military defense attorneys, he waived his right to have the government prove its case. Furthermore, since he had completed at least 16 years but less than 20 years of active service creditable towards retirement, he was entitled to lengthy service probation consideration. However, he did not request such consideration. Despite the fact that the applicant had two separate opportunities to contest the charge against him and prove his innocence while on active duty, counsel comes before this Board, where it is now the applicant's burden to prove an error or injustice, contending the results of the DNA testing prove that the applicant's urine sample was tainted with the urine of another individual.

AR II at 7. The Board did not explain what it considered the "two separate opportunities to contest the charge" to be, and the Board does not appear to have made any inquiry into the voluntariness *vel non* of MSgt. Metz's decision to request separation, or the adequacy of counsel's representation of him in that regard. Its fact-finding process was limited to receiving written materials from MSgt. Metz and Air Force files and requesting advisory opinions from Air Force officials.

## STANDARDS FOR DECISION

### 1. Motion to Dismiss

The jurisdiction of a federal court must be established as a threshold matter before the court may proceed to the merits of any action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The party who asserts jurisdiction, *i.e.*, Master Sergeant Metz in this instance, bears the burden of proving that the Court has jurisdiction over the subject matter of his complaint. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir. 1998); *Ware v. United States*, 57 Fed.Cl. 782, 784 (2003); *Clearwater Constructors, Inc. v. United States*, 56 Fed.Cl. 303, 307 (2003). In ruling on a motion to dismiss for lack of jurisdiction, the Court must construe the allegations of the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000).

Additionally, when the underlying facts establishing jurisdiction are put in question, the Court may provide for the receipt into evidence of materials beyond those facts included on the face of the pleadings. *McNutt*, 298 U.S. at 189, 56 S.Ct. 780; *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993); *Ware*, 57 Fed.Cl. at 783 n. 1. In the context of a service member's assertion that his separation from the military was involuntary, "[i]f the plaintiff alleges facts that would make out a prima facie case of involuntariness if proven, then he is entitled to a hearing on the voluntariness issue." *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed.Cir.1999). In accord with this precedent, the Court conducted an evidentiary hearing on April 19 and 20, 2004, at which the parties were afforded the opportunity to present evidence related to MSgt. Metz's claim that his separation was involuntary because of ineffective assistance of counsel.[23]

### 2. Summary Judgment Upon the Administrative Record

For motions under RCFC 56.1, *i.e.*, for summary judgment upon review of decisions

---

**23.** Effectiveness of counsel is a mixed question of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden of proof to be used by the Court in evaluating a claim that counsel's assistance was ineffective is drawn from *Strickland* and requires that the claimant show both that counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed a defendant by the Sixth Amendment and that there was a reasonable probability that, but for counsel's errors, the outcome would have been different. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *see also United States v. Dominguez Benitez*, —— U.S. ——, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

on the basis of an administrative record, this Court applies the same standard as that applied to motions for summary judgment under RCFC 56. *See* RCFC 56.1(a); *Roth v. United States,* 56 Fed.Cl. 239, 244–45 (2003). Summary judgment is appropriate if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This Court's role in military record cases is a limited one. "It has long been established that it is 'beyond the institutional competence of courts to review' the substance of decisions that have been left exclusively to the discretion of the military." *Roth,* 56 Fed.Cl. at 244 (quoting *Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002)). *See also Groves v. United States,* 47 F.3d 1140, 1144 (Fed.Cir. 1995) ("no court is qualified to review the substantive merits of a decision [committed to the discretion of the military], so long as the decision comports with any procedural standards mandated by statute or regulation"). Accordingly, when the Court, in the context of a motion made under Rule 56.1, is "called upon to review a decision of a corrections board, ... the standard of review is whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir.1998); *see also Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed. Cir.1986); *Sanders v. United States,* 219 Ct. Cl. 285, 594 F.2d 804, 811 (1979); *Roth,* 56 Fed.Cl. at 245.

In undertaking its review under Rule 56.1, this Court typically focuses on the record developed through agency proceedings, not a new record generated before the reviewing court. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). *But cf. Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir. 1989) (listing eight exceptions to the general rule, quoting Steven Stark and Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action,* 36 Admin. L.Rev. 333, 345 (1984)). Application of the "arbitrary and capricious" standard has two different templates in an administrative record review case.

First, disputes of fact occurring in the proceedings before the agency and addressed and resolved by the agency are reviewed by this Court under the arbitrary and capricious standard. *See Colorado Constr. Corp. v. United States,* 57 Fed.Cl. 648, 650 (2003). Disputes of fact arising in relation to jurisdictional issues may rest upon a different footing because this Court, not the agency, may be the fact-finder as to those issues. In this case, such disputes arise with consideration of MSgt. Metz's claim of ineffective assistance of counsel because that claim bears directly upon the voluntariness of his request for separation from the military in lieu of a court-martial. *See Tippett,* 185 F.3d at 1255. The AFBCMR completely bypassed that question. Respecting that issue, the Court has found facts based upon the testimony and evidence adduced at the evidentiary hearing and has set out those facts in this opinion as required by RCFC 52(a).

Disputes of fact may arise respecting issues not falling into either of these categories. If such other factual issues concern areas in which the pertinent agency has authority and competence, a remand to the agency may be appropriate. *See PGBA, LLC v. United States,* 60 Fed.Cl. 196, 204 n. 11 (2004); *Christensen v. United States,* 60 Fed.Cl. 19, 27–28 (2004). Because of the Court's findings and conclusions regarding the effectiveness of MSgt. Metz's counsel and the consequent involuntariness of his request for separation in lieu of trial by court-martial, such issues arise in this case and are remanded to the Secretary of the Air Force.

## ANALYSIS

### A. Jurisdiction

#### 1. *Subject matter jurisdiction—Tucker Act and Military Pay Act.*

The Tucker Act, 28 U.S.C. § 1491, governs whether this particular case falls within the subject matter jurisdiction of the Court. This statute provides that the Court has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any

express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). However, it is well established that the Tucker Act is not sufficient, in and of itself, to confer jurisdiction upon the Court. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Rather, a plaintiff must identify some independent basis by way of a contract, a federal statute or regulation, or the Constitution upon which it is entitled to monetary payment from the federal government. *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *James v. Caldera,* 159 F.3d 573, 580 (Fed. Cir.1998) (reversing a transfer to the Court of Federal Claims from a district court absent a determination that the plaintiff had properly stated a claim for money damages).

■ In this instance, the Military Pay Act, 37 U.S.C. § 204, provides an adequate statutory basis for MSgt. Metz's claim. That Act has been held to be a money-mandating statute sufficient to confer jurisdiction upon this Court. *Palmer v. U.S.,* 168 F.3d 1310, 1314 (Fed.Cir.1999); *Caldera,* 159 F.3d at 581 ("If an enlisted member of the Armed Services is wrongfully discharged before the end of his or her current term of enlistment, the right to pay conferred by § 204 continues and serves as the basis for Tucker Act jurisdiction."). However, when a service member is voluntarily discharged from the military, his or her right to pay ends upon discharge, likewise ending his or her statutory entitlement to compensation and removing the money-mandating statutory basis for jurisdiction in this Court. *See Tippett,* 185 F.3d at 1255 (citing *Adkins v. United States,* 68 F.3d 1317, 1321 (Fed.Cir.1995)). Conversely, if a plaintiff's "discharge was involuntary and improper, his statutory right to pay was not extinguished and thus serves as a basis for Tucker Act jurisdiction." *Id.*

### 2. *Involuntary discharge—ineffective assistance of counsel.*

■ MSgt. Metz has argued that his decision to seek a separation from the Air Force rather than face a trial on the drug charge was not voluntarily made because the advice and assistance he received from his counsel at that stage of the proceedings were ineffective. Pl.'s Mot. for Summ. J. at 8–10. Specifically, he argues that his counsel failed to investigate and to inform him of all of the possible defenses available, including the possibility of having a DNA analysis conducted on the urine sample, and of all the consequences of a separation in lieu of a court-martial, and thus that his "consent to separate was not informed and was not voluntary." *Id.* at 10.

Every criminal defendant, whether before a military or civilian tribunal, is entitled to effective assistance of counsel in conducting his or her defense. U.S. Const. amend. VI; *Strickland v. Washington,* 466 U.S. at 687–96, 104 S.Ct. 2052; *United States v. Cain,* 59 M.J. 285, 294 (C.A.A.F.2004).[24] The Supreme Court in *Strickland* developed a two-pronged test for determining whether a criminal defense attorney's assistance was deficient. First, the criminal defendant must show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* This same two-part test has been adopted for evaluating the performance of defense counsel in military cases. *See Cain,* 59 M.J. at 294; *United States v. Boone,* 42 M.J. 308, 313 (C.A.A.F. 1995); *United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987). *See also Longval v. United States,* 41 Fed.Cl. 291, 296 (1998). The procedures and regulations in place in the context of a court-martial are specifically designed to protect the defendant's right to counsel. *See, e.g.,* R.C.M. 502(d) (qualifica-

---

**24.** While decisions of the Court of Appeals for the Armed Forces and the various service courts of appeals are not binding on this Court, the Court recognizes these military courts' jurisdiction over the attorneys who practice before them and the special expertise of these courts in ad-

dressing the rights of defendants appearing before courts-martial. The decisions of the military courts accordingly provide a valuable guide for analyzing the performance of MSgt. Metz's counsel.

tions for counsel);[25] R.C.M. 506 ("Accused's rights to counsel"); AFR 39–10, ch. 4, ¶ 4–3(c) ("Before they apply for discharge under [Chapter Four], airmen must be given an opportunity to consult legal counsel.").

Defense counsel practicing before any criminal tribunal enjoy a strong presumption of competence, and when a criminal defendant raises allegations of ineffective assistance, that "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). In evaluating an attorney's performance in light of this presumption, the Court must decide whether the attorney's actions were "reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. 2052. *See also United States v. Adams*, 59 M.J. 367, 370 n. 5 (C.A.A.F.2004).[26] If a criminal defendant overcomes the presumption of competence, he may meet his burden to establish prejudice by showing that the attorney's errors were so serious as to deprive him of a proceeding the results of which are reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

As an initial matter, because different attorneys were involved to some extent in advising MSgt. Metz in relation to the drug charges, the Court must determine whose actions should be evaluated to determine whether MSgt. Metz received effective assistance. In the context of a court-martial, a defendant is automatically assigned a military defense lawyer, called the "detailed defense counsel." UCMJ Art. 27; R.C.M. 501(b). An accused also has the right to choose for himself or herself a civilian attorney, whose fees are paid solely by the accused, to serve as his or her "civilian defense counsel." UCMJ Art. 38(b)(2); R.C.M. 506(a).[27] When an accused hires a civilian defense counsel, that attorney effectively takes over the defense while the detailed defense counsel remains as a junior member of the defense team. UCMJ Art. 38(b)(4). The Court of Appeals for the Armed Forces has described the typical arrangement between civilian and detailed defense counsel as follows:

> Ordinarily, when an accused hires civilian counsel, the civilian counsel becomes lead counsel[,] and detailed military counsel serves as assistant defense counsel. The lead defense counsel determines the duties to be performed by his or her assistants and the extent of participation of his assistants. Even an assistant who has no duties remains a member of the defense team unless excused by proper authority.

*United States v. Cornett*, 47 M.J. 128, 133 (C.A.A.F.1997). *See also* R.C.M. 502(d) (note) ("When the accused has ... civilian defense counsel, the detailed counsel is 'associate counsel' unless excused from the case. *See* R.C.M. 506(b)(3)."). An associate defense counsel may perform any duty that a defense counsel normally may perform "[u]nder the supervision of the defense counsel." R.C.M. 502(d)(6).

In this connection, the government asserts that any failure on Mr. Callahan's part to provide adequate assistance to MSgt. Metz may not be held against the government because "holding the [g]overnment responsible for the acts and omissions of people

**25.** Proceedings before and in relation to a court-martial are governed by the Manual for Courts–Martial ("M.C.M."), which contains the Rules for Courts–Martial ("R.C.M."). The M.C.M. was revised in 1995, shortly after the relevant events in this case. Accordingly, the Court's references to the M.C.M. and R.C.M. are to the previous edition, promulgated in 1984.

**26.** Consideration of *all* the pertinent circumstances is relevant to an evaluation of both prongs of *Strickland*—counsel's performance and prejudice to the accused—as the Supreme Court recently emphasized in addressing a related issue arising under Fed.R.Crim.P. 11. *See Dominguez*

*Benitez*, —— U.S. ——, 124 S.Ct. 2333 ("Other matters that may be relevant ... are the overall strength of the Government's case and any possible defenses that appear from the record, subjects that courts are accustomed to considering in a *Strickland* or *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] analysis.").

**27.** An accused may also specify a military attorney whom he would like to have represent him. UCMJ Art. 38(b)(3)(B). Such a selection results in the dismissal of the accused's detailed defense counsel. UCMJ Art. 38(b)(5).

whom the [g]overnment does not select, train or supervise would be fundamentally unfair." Def.'s Post–Trial Br. at 4. The government's argument on this point is unavailing. First, attorneys who serve as civilian defense counsel before courts-martial are within the control of the government insofar as they are regulated by the military's procedural rules and codes of conduct, they must meet certain qualifications set forth by the military and Congress, and they must be approved by the presiding military judge. *See* R.C.M. 109; R.C.M. 502(d)(3); R.C.M. 901(d). *See also* 10 U.S.C. § 842 (Oaths); R.C.M. 807 (same). Second, the actions of civilian defense counsel have been repeatedly scrutinized by the military courts of appeals to determine whether their actions amounted to ineffective assistance such that a conviction pursuant to a court-martial should be overturned. *See, e.g., Adams,* 59 M.J. 367; *United States v. Sorbera,* 43 M.J. 818 (A.F.Ct.Crim.App.1996). Moreover, in the context of a court-martial, "[w]here an accused is represented by both civilian counsel and detailed military counsel, the performance of defense counsel is measured by the combined efforts of the defense team as a whole." *Boone,* 42 M.J. at 313. *See also Cornett,* 47 M.J. at 133; *United States v. McConnell,* 2000 WL 1050018 at *4 (A.F.Ct.Crim.App. July 7, 2000). Accordingly, in this case the Court must consider the actions of all of MSgt. Metz's attorneys as a team, including Lt. Col. Dusseau, Mr. Callahan, and the unnamed captain who was briefly assigned to represent him when the charges were first preferred.

Viewed collectively, the actions of MSgt. Metz's defense counsel were minimal. The unnamed captain who initially represented MSgt. Metz appears to have done nothing of any note. She had the case for approximately a month before her departure on another assignment and provided MSgt. Metz with no advice or counseling. After she left Robins

AFB, MSgt. Metz was unrepresented for a period of time, probably ten days or two weeks in duration. When Lt. Col. Dusseau took over MSgt. Metz's case, he became familiar with the charges, talked with MSgt. Metz, and interviewed the person who had monitored the urine collection process. He failed to explain why further interviews or depositions were not pursued and why no expert was consulted to obtain even a preliminary opinion of how to proceed in light of MSgt. Metz's low-nanogram urinalysis result and his insistence of innocence. Lt. Col. Dusseau was working in tandem with Mr. Callahan in another drug case at the same time, but he did not contact the expert used in that case about the urinalysis result in MSgt. Metz's case. Lt. Col. Dusseau did not investigate the possibility of retesting MSgt. Metz's urine sample or of conducting a DNA analysis through a private laboratory.[28] He appears to have been aware that some sort of DNA analysis may have been available through the military, though he did not request that such a test be performed and did not discuss the availability of such a procedure with MSgt. Metz. Mr. Callahan consulted with MSgt. Metz on one occasion in his Atlanta office, and he conducted a review of the charges and of the prosecution file. He also did not investigate the facts and defenses that might have been invoked on MSgt. Metz's behalf, although he was not retained as counsel for that purpose.

In short, neither the unnamed captain nor Lt. Col. Dusseau nor Mr. Callahan adequately represented MSgt. Metz. The only defense that they considered was the "good soldier" defense, based on MSgt. Metz's exemplary record prior to the charges. Hr'g Tr. at 174 (Lt. Col. Dusseau testified that "I've had good military character defenses.... I don't recall cases that were like this, to be honest. This is a unique case.").[29] Even then, it is

---

28. Indeed, Lt. Col. Dusseau at the evidentiary hearing expressed his reluctance to consider asking for a retest of MSgt. Metz's urine sample. As he said, "[i]f the accused had gone out on [hi]s own and had done his own testing, then ... perhaps that would have been an option. To request it from the government, then that is going to be used by both the prosecution and the defense." Hr'g Tr. at 168.

29. In addition to providing a possible defense or mitigating element in relation to the merits of the drug charge at trial, MSgt. Metz's long service with an excellent record would have entitled him to special probation consideration in the context of his Chapter Four separation. Specifically, Chapter Four provided that if an enlisted member of the Air Force applying for separation in lieu of trial by court-martial "[h]as at least 16

not evident that any of the three discussed that defense with MSgt. Metz.[30] In effect, MSgt. Metz was told by his counsel, principally Lt. Col. Dusseau, that if he contested the charges he would be convicted and would receive a bad conduct discharge and time in prison:

Q   What did you do to make contact with Mr. Callahan?

A   I initially called him, and then ended up driving to Atlanta and meeting with him.

Q   How often did you meet with Mr. Callahan?

A   That was it.

Q   Just that one time?

A   Yes, within the same—the same person to person, that was the only time.

Q   Did you talk to him at any other time on the telephone?

A   Yes, I did.

Q   And how often?

A   Once or twice.

Q   And do you recall Mr. Callahan's advice to you?

A   As time progressed, it's pretty much exactly what Captain Dusseau['s] was.  If you go in there, it's not going to come out good. You're going to end up be[ing] convicted.  You're going to get a federal conviction, a bad conduct discharge, and you'll probably end up doing time in the brig, as he put it.

Q   To your knowledge, did Mr. Callahan have a naval background?

A   I assumed he did when he used the term "brig."

Q   Right.

A   But I didn't ask him.

*Id.* at 29–30.

The evidence is equally troubling regarding the lack of counseling Mr. Metz received about the Request for Discharge in Lieu of Trial by Court–Martial.  MSgt. Metz testified that he had to ask his *post*-separation counsel about key elements of this Request:

THE COURT: Mr. Metz, the first sentence of that paragraph [¶ 6 of the Request] says, "If this discharge is approved, I understand I am entitled to lengthy service probation consideration."

THE WITNESS: Yes.

THE COURT: How had you become familiar with that consideration?

THE WITNESS: I'm not—I wasn't for sure exactly what that was, and I had to talk to Mr. Myers about that.

THE COURT: All right.  Do you recall discussing that in any respect with either Mr. Callahan or Captain Dusseau?

THE WITNESS: No.  No, I don't.

THE COURT: The next sentence of paragraph 6 says, "I read and I understand Section F of Chapter 6, and do not request lengthy service probation consideration in the Office of the Secretary of the Air

---

years of active service at the time the application is submitted, lengthy service consideration according to chapter 6, subsection F, is required upon request of [the] member." AFR 39–10, ch. 4, ¶ 4–8(a).  Section F of Chapter Six of AFR 39–10 provided as follows:

> 6–35.  Policy Explained.  An airman with lengthy service is one who has completed at least 16 but less than 20 years' active service creditable toward retirement at the time discharge action starts.  These airmen, nearing retirement eligibility, are entitled to special consideration for probation upon their request. This section applies only to them.  They are not discharged until their cases have been referred to HQ AFMPC/DPMARS2 for further review .... If that review results in an offer of probation, the terms of the probation for each case will be set out in the authorizing correspondence.
> NOTE: Approved discharge will be executed if member does not request review.

**30.**  MSgt. Metz testified that none of his counsel spoke with him about invoking his prior exemplary service as a defense to, or in mitigation of, the charges:

> Q   Did anyone discuss with you the prospect of getting convicted but not getting a bad conduct discharge?
> A No.
> Q   Because of your length in the service?
> A No.
> Q   Did anyone discuss with you the fact that if you did seek separation now [a]part from the court-martial, but if you did seek separation, that because of your lengthy service, the secretary of the air force would have to approve your separation unless you waived lengthy service consideration?
> A   If that was discussed with me, I don't remember, but if it would have been it would seem like I would definitely remember something like that.
> Hr'g Tr. at 32.

Force in accordance with that section." Had you read and did you understand—well, let's not make it a compound question. Let's say, had you read Section F of Chapter 6?

THE WITNESS: I don't recall if I did, but once I found out what the lengthy service probation consideration was, if I would have, I would have remembered it. I don't recall reading it.

THE COURT: Do you recall either Mr. Callahan or Captain Dusseau giving you a copy to read or anyone else giving you a copy to read?

THE WITNESS: No, sir, I don't.

THE COURT: You have no recollection of reading it?

THE WITNESS: No.

*Id.* at 41–42. Lt. Col. Dusseau essentially confirmed MSgt. Metz's testimony on this point:

> Q Do you recall Sergeant Metz asking any questions about the wording of the request for discharge?
>
> A I don't recall being questioned concerning the wording. Again, this is from a template. So I don't recall whether we actually pulled out Chapter 4 of the regulation and went through it with him, to be honest, but it was a template.

*Id.* at 146.[31] Similarly, on cross-examination, MSgt. Metz testified that he was not advised by his counsel about collateral consequences of a separation in lieu of trial by court-martial:

> Q Mr. Metz, if you look at paragraph 3 of AR–17, in discussing a request for a discharge, and the type of discharge you might receive, do you recall that Captain Dusseau informed you that a discharge under other than honorable conditions would result in you—could result in your not being entitled to veterans benefits?

THE WITNESS I don't recall that being discussed.

*Id.* at 44.

Also illuminating is the fact that MSgt. (then Mr.) Metz caused the urine sample to be analyzed for DNA promptly after being separated from the Air Force:

> THE COURT: What were the circumstances in which you caused that step to be taken?
>
> THE WITNESS: I had—on the advice of my father, I had contacted Mr. Myers. I found him in the back of the Air Force Times, which I was still subscribing to. And he informed me about the DNA testing, and that was the first time I had ever heard of that, that that could be done on urine.
>
> THE COURT: Do you recall when that was?
>
> THE WITNESS: I want to say I initially contacted him in early '95. I'm pretty sure that's when it was.
>
> THE COURT: Did you say you contacted him on the advice of your father?
>
> THE WITNESS: My dad told me to get an attorney and try to fight this thing. I think my father said something about there [are] other testing methods that ... could be done or something to that effect. I didn't know. He didn't say DNA, but I found that out once I contacted Mr. Myers.
>
> THE COURT: Did you talk with your father in any detail about this matter as you were being advised by Mr. Callahan and Captain Dusseau, and prior to your decision to request discharge in lieu of probable court-martial?
>
> THE WITNESS: Yes, I had talked to my father during the time that this was going on, yes.

---

31. Lt. Col. Dusseau testified that he had consulted with the Judge Advocate's office at Robins AFB about the Request:

> Q Do you remember discussing the need to waive lengthy service probation consideration with Mr. Metz?
>
> A I don't specifically recall talking about it, but obviously we did go through this request. We did talk about the rights, and that was one

of the rights that he could request. But I can tell you that my understanding—prior to submitting to Chapter 4, I had spoken with Sergeant Metz to see if this was something he was receptive to, and I also connected with the legal office, and this would have been part of the understanding between the legal office and ourselves as part of the Chapter 4 request. Hr'g Tr. at 148–49.

THE COURT: Do you know what prompted your father to make the suggestion he did subsequently?

THE WITNESS: No, I don't.

*Id.* at 43–44.

The Court finds that the combined efforts of MSgt. Metz's attorneys did not adequately ensure that the case was investigated and that MSgt. Metz was informed of possible defenses and choices available to him or of the possible consequences of his opting to separate in lieu of a trial by court-martial. The counsel initially detailed to represent him utterly failed to assist him and in effect left him without counsel of any sort for a month or more in the face of serious criminal charges. Mr. Callahan's involvement in the case was limited and marginal, being purely of a reviewing and consultative nature. Mr. Callahan did not file an appearance in the court-martial proceedings and did not act as MSgt. Metz's lead counsel. Lt. Col. Dusseau's handling of the case reflected a mistaken position that he was a junior team member and not lead counsel. In short, MSgt. Metz was ineffectively and inadequately represented during his court-martial proceedings and in connection with his Request for Discharge in Lieu of Trial by Court–Martial.

The Court further finds that MSgt. Metz was prejudiced by his counsel's lack of adequate preparation and advice. The DNA test results themselves cast grave doubt on the validity of the urine sample that was the only evidence against MSgt. Metz. Moreover, the Air Force laboratory's subsequent destruction of the remaining portion of the urine sample prevents any meaningful scientific resolution of the DNA results reported by the Seattle Laboratory of Pathology. The less-than-credible *post hoc* rationalization for the destruction of the urine sample further weakens the Air Force's posture.

The government has argued that, even if MSgt. Metz's counsel's performance was substandard, he was not prejudiced because he cannot prove that he would have been acquitted at trial. Def.'s Post–Trial Br. at 13–23. The government's argument misconstrues the nature of the standard established by the Supreme Court in *Strickland* and implement-ed by the military courts of appeals. Rather than demonstrate that he would, without a doubt, have been acquitted absent the shortcomings of his counsel, an accused needs to demonstrate that he was denied a "a reliable adversarial testing process," *i.e.*, that he did not receive the "assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; *see also id.* at 688, 104 S.Ct. 2052. When counsel fails to investigate a potential defense adequately, such failure may prejudice the accused. *See United States v. Gibson*, 51 M.J. 198 (C.A.A.F.1999) (finding ineffective assistance prejudicial to the accused because "defense counsel's failure to investigate the evidence in the CID report deprived appellee of 'a fair trial, a trial whose result is reliable.'" (quoting lower court's unpublished opinion that quotes *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, and *Scott*, 24 M.J. at 188)); *United States v. Wean*, 45 M.J. 461, 464 (C.A.A.F.1997) ("[I]t was clear the deficiencies in [counsel's] performance were not due to tactical decisions but, rather, were due to his failure to investigate, prepare, and research."); *Scott*, 24 M.J. at 193 ("[Counsel's] failure to promptly investigate was not the result of strategy or a reasonable decision not to investigate. Rather, it was simply the result of a lack of preparation."). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

The government has characterized the decision by counsel to seek a Chapter Four separation rather than to proceed to trial, as well as the choice not to pursue any further analysis of the urine sample, to be merely tactical decisions within the normal prerogative of trial counsel. Hr'g Tr. at 8 (Jan. 7, 2004). However, it was incumbent upon MSgt. Metz's counsel to ensure that he was adequately informed of the rights he was waiving. *See Strickland*, 466 U.S. at 688, 104 S.Ct. 2052 (defense counsel bears "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of

important developments in the course of the prosecution"). MSgt. Metz's counsel merely put forward a request that reflected a standard template[32] and failed to explain the terms of, let alone provide him with adequate advice on, seeking a Chapter Four separation in lieu of trial. Accordingly, MSgt. Metz's agreement to do so, based upon the advice of counsel, could not have been adequately informed. Therefore, the Court finds that MSgt. Metz's separation from the Air Force was involuntary. Consequently, this Court possesses jurisdiction to grant relief upon his claim, and the government's motion to dismiss must be denied.

## B. Judgment Upon the Administrative Record

MSgt. Metz and the government have each asked the Court respectively to reverse or affirm the AFBCMR's decision and enter judgment based upon the administrative record. When a court reviews the ruling of a military corrections board to determine whether it was arbitrary, capricious, made in bad faith, unsupported by evidence, or contrary to law, it applies the "substantial evidence rule." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983). To challenge the Board's decision successfully, MSgt. Metz must point to substantial evidence showing that the Board's conclusions were not supportable or were contrary to law.

In each instance that the AFBCMR considered MSgt. Metz's case and denied relief, it justified such denial in part on the observation that MSgt. Metz had voluntarily chosen to waive his right to a trial by court-martial after consultation with counsel. AR 18 (quoted *supra,* at 162); AR II 7 (quoted *supra,* at 164). In light of the Court's finding that MSgt. Metz's decision to seek a Chapter Four separation was not made voluntarily due to ineffective assistance of coun-

sel, the Court cannot affirm the Board's denial of relief to MSgt. Metz on this ground.

The Board also based its decisions on a finding that MSgt. Metz had not produced evidence sufficient to challenge the chain of custody of the urine sample between the time it was collected and the time it was tested for marijuana metabolites. AR I 7–8; AR II 8. The Court determines that the DNA test results obtained by the Seattle Laboratory of Pathology and the Air Force's subsequent mishandling and destruction of the urine sample constitute more than ample evidence to overcome any presumption of regularity that the chain of custody might provide. The Court consequently denies the government's motion for judgment upon the administrative record and grants MSgt. Metz's cross-motion.

## C. Relief

### 1. Back pay and correction of records.

It remains to be determined what relief is due to MSgt. Metz in light of the Court's findings and conclusions set forth above. Plaintiff requests two forms of monetary relief: (1) active duty pay and allowances for the period between his separation and December 26, 1997, which would have been the twenty-year anniversary of his original enlistment, and (2) retirement pay of a Master Sergeant from December 26, 1997. He also requests that the Court (1) direct the Air Force to expunge from his record all references to his separation in lieu of court-martial and his discharge under other than honorable conditions, and (2) direct the Air Force to change his records to indicate that he served on active duty for a total period of twenty years and retired on December 26, 1997, with the rank of Master Sergeant. Finally, he requests attorney fees, costs, and litigation expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

---

**32.** Chapter Four contains a "Sample Request for Discharge in Lieu of Trial by Court–Martial." The Request prepared by Lt. Col. Dusseau and signed by MSgt. Metz appears to have been drawn directly from this model. *Compare* AR I 17, *with* AFR 39–10, ch. 4, fig. 4–1. However, the Request prepared by Lt. Col. Dusseau is deficient even in relation to the template because it does not include a "summary of the evidence"

provided to MSgt. Metz or a list of the "documents pertaining to the (offense) (offenses) with which [he was] charged" as envisioned by the template. AFR 39–10, ch. 4, fig. 4–1. MSgt. Metz's Request also does not include such rudimentary elements as Metz's social security number or his civilian defense counsel's address, which are both called for in the template. *Id.;* AR I 17–18.

■ As a general rule, under the "constructive service" doctrine, "military personnel who have been illegally or improperly separated from service are deemed to have continued in active service until their legal separation." *Christian v. United States*, 337 F.3d 1338, 1347 (Fed.Cir.2003). "They are, therefore, entitled to back pay and benefits for the intervening period, i.e., retroactive to their original separation from service." *Id.* However, for an enlisted person, a limit to this general rule exists due to the nature of the term of enlistments. "Because no one has a right to enlist or reenlist in the armed forces unless specially granted one, an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired had he not been so discharged." *Dodson v. United States Gov't, Dep't of the Army*, 988 F.2d 1199, 1208 (Fed.Cir.1993) (citing *Maier v. Orr*, 754 F.2d 973, 983 (Fed.Cir.1985)). *See also James v. Caldera*, 159 F.3d at 582 (Fed. Cir.1998) (holding that an enlisted service member discharged upon the completion of his then-current enlistment was not entitled to pay under 37 U.S.C. § 204 and opining that "[i]n the case of a wrongful discharge during his unexpired term of enlistment (as extended), [plaintiff] would have been entitled to backpay from the period from the date of the discharge to the end of the extended term"); *Middleton v. United States*, 170 Ct.Cl. 36, 39–42, 1965 WL 8295 (1965). In the event that MSgt. Metz's remaining term of enlistment would have been shorter than the time required for him to attain full retirement eligibility, he would not be entitled to the retirement benefits he has requested absent a showing that he was entitled to have his enlistment extended. *See generally Austin v. United States*, 206 Ct.Cl. 719, 724, 1975 WL 22844 (1975) (describing instances in which an enlisted member was entitled to mandatory re-enlistment); *see also James v. Caldera*, 159 F.3d at 580 (quoting *Austin* and recognizing that decision's continuing validity). The Court does not have any evidence regarding the amount of time remaining on MSgt. Metz's enlistment at the time of his discharge. His military personnel records were withheld from the administrative record submitted for the Court's review. AR I 68. Because the Court lacks the requisite information to determine the remainder of MSgt. Metz's enlistment, the Court cannot rule as to the amount of back pay to which he is entitled or as to whether he would have been entitled to retire upon the twenty-year anniversary of his entering the service.[33]

■ Additionally, the amount of MSgt. Metz's recovery may be further limited by any salary that MSgt. Metz earned as a civilian after his separation from the Air Force. "It is well established that a servicemember deprived of military pay because of a wrongful separation must generally mitigate his or her damages with any income from subsequent civilian employment." *Montiel v. United States*, 40 Fed.Cl. 67, 69 (1998) (citing *Groves v. United States*, 47 F.3d 1140, 1147 (Fed.Cir.1995); *Motto v. United States*, 175 Ct.Cl. 862, 869, 360 F.2d 643, 647 (1966)). *See also Middleton v. United States*, 175 Ct.Cl. 786, 792, 1966 WL 8875 (1966). Accordingly, the amount of pay to which MSgt. Metz is entitled for the period between his separation and the expiration of his enlistment term, plus any additional reenlistment term to which he was entitled, must be reduced by the salary he earned as a civilian during that period. The Court, understandably, does not have evidence as to such amounts before it.

Even though a precise award of back pay cannot be made at this juncture, this Court is authorized to grant MSgt. Metz certain relief

---

33. The AFBCMR's second decision was based in part on an advisory opinion received from the Air Force's personnel center that concluded that Metz would not be entitled to retirement under either a temporary early retirement program or the military's standard twenty-year retirement program. AR II 98–99. This latter conclusion is based upon the mistaken opinion that "[t]here are no provisions of law to grant credit for un-served service." AR II at 99. As noted, the constructive-service doctrine provides specifically for such credit. To the extent that the Board's decision was based upon this erroneous legal conclusion, it is not in accordance with law. Upon remand the Air Force may not rely on the personnel center's opinion to deny MSgt. Metz's entitlement, if he otherwise would qualify, for retirement.

based upon the record as it now exists because such relief is "incident of and collateral to" the monetary award to which MSgt. Metz is entitled. *See Voge v. United States*, 844 F.2d 776, 781 (Fed.Cir.1988) (citing *Silbert v. United States*, 566 F.2d 1190 (Ct.Cl.1977); *Austin*, 206 Ct.Cl. at 723). In pertinent part, 28 U.S.C. § 1491(a)(2) states:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

*See Bates v. United States*, 34 Fed.Cl. 51, 53 (1995) (collecting cases in which this Court and its predecessors have awarded non-monetary relief in military pay cases). In accord with this statute and the proofs in this case, the Court determines that, in addition to the monetary back pay award, MSgt. Metz is entitled to the following non-monetary relief: (1) MSgt. Metz's separation shall be set aside along with his discharge under other than honorable circumstances, (2) Msgt. Metz shall be restored to his position as a Master Sergeant in the Air Force for the remaining term of his enlistment plus any extended period to which he may be or may have been entitled under law or regulation, and (3) if he is eligible, MSgt. Metz shall be placed in appropriate retirement status. The Secretary of the Air Force is directed to take these actions as soon as practicable. *See Krzeminski v. United States*, 13 Cl.Ct. 430, 441–42 (1987). *See also White v. Secretary of the Army*, 878 F.2d 501, 506 (D.C.Cir.1989) (citing *Carter v. United States*, 213 Ct.Cl. 727, 1977 WL 9578 (1977)).

## 2. Remand.

The Tucker Act authorizes this Court to order a remand by providing, in relevant part, that "[i]n any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2). Likewise, Rule 56.2 of the Rules of the Court of Federal Claims authorizes the issuance of a remand order and specifies the procedural framework for such an order.

Pursuant to this authority, the Court orders that this matter be remanded to the Secretary of the Air Force. This Court does not have sufficient facts at hand to frame a back-pay order or to address MSgt. Metz's entitlement to retirement and other benefits from the military. The Court orders that the Secretary of the Air Force shall determine the appropriate amount of back-pay and other monetary and non-monetary benefits to which MSgt. Metz is entitled in light of the Court's holdings. Through appropriate fact-finding proceedings, the Air Force is also directed to make findings regarding, and to apply, any offset to the back pay due that might arise from MSgt. Metz's civilian employment.[34] In this connection, the Air Force is instructed to determine what portion of his enlistment was left unserved at the time of MSgt. Metz's separation. In the event that his enlistment would have expired prior to his becoming eligible for retirement, the Air Force is instructed to determine whether he would have been entitled to re-enlistment and subsequent retirement upon completion of a new or extended enlistment term. In the event that his enlistment would have extended until he had served the twenty years normally required for retirement eligibility, the Air Force is instructed to determine the retirement benefits to which he would have been entitled on his twenty-year service anniversary as well as the amount of

---

[34]. The Air Force has neither a special authority over, nor competence in, fact-finding proceedings respecting such an offset. This Court is undoubtedly better suited to conduct such proceedings and to make findings in that regard. *See Middleton*, 175 Ct.Cl. at 790–96. *See also Krzeminski*, 13 Cl.Ct. at 441 n. 21 ("The factual and procedural record is sufficient for the court to rule [without recourse to a remand]."). *Cf. Bannum, Inc. v. United States*, 60 Fed.Cl. 718, 725–26 n. 9 (2004); *PGBA, LLC*, 60 Fed.Cl. at 204 n. 11. However, to avoid multiplicitous proceedings, this Court, as a matter of its discretion in accord with 28 U.S.C. § 1491(a)(2), includes the computation of a setoff in the instructions for remand to the Secretary of the Air Force.

such benefits. The Air Force is instructed to complete the inquiries set forth in this paragraph within six months from the date of this Opinion and Order. Pursuant to RCFC 56.2(a)(5), counsel for defendant shall report to the Court the status of proceedings on remand every sixty days until the Court's instructions have been carried out.[35]

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is DENIED. Defendant's alternative motion for summary judgment upon the administrative record is DENIED. Plaintiff's motion for summary judgment upon the administrative record is GRANTED IN PART. MSgt. Metz's separation in lieu of trial by court-martial shall be set aside, and his discharge under other than honorable conditions shall be elided. He shall be restored to his position as a Master Sergeant in the Air Force for the remaining term of his enlistment plus any extended period of enlistment to which he was or may be entitled under existing law or regulation. If eligible, MSgt. Metz shall be placed in appropriate retirement status. His records are ordered to be corrected in the foregoing respects.

This case is remanded for six months to the Secretary of the Air Force for further proceedings consistent with the specific directions set forth above. All other proceedings in this case shall be STAYED during the period of remand.

MSgt. Metz's claim for attorney fees, costs, and litigation expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is deferred until completion of the remand proceedings.

It is so ORDERED.

---

35. The results of the proceedings on remand are, of course, subject to this Court's review. *See,* *e.g., Christian v. United States,* 60 Fed.Cl. 550, 551 (2004).